IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL INSURANCE COMPANY,     )
                               )
           Plaintiff,          )
                               )
     vs.                       )   Civil Action No. 07-581
                               )
PHILOTIMO, INC., doing business as  )   Chief Magistrate Judge Amy Reynolds Hay
NICKOS CHIMNEY COMPANY,        )
                               )
           Defendant.          )

**MEMORANDUM OPINION**

HAY, Magistrate Judge

The Plaintiff, Federal Insurance Company ("Federal" or "Plaintiff"), an Indiana corporation with its principal place of business in New Jersey, issued a homeowner's policy to Mark Gera ("Gera") covering his residence on Furnace Run Lane in Laughlintown, PA. In February 2006, Gera hired the Defendant, Philotimo, Inc., a Pennsylvania corporation doing business as Nikos Chimney Company ("Nikos" or "Defendant"), to perform work on the fireplace and chimney at his residence. Shortly thereafter, in April 2006, a fire caused extensive damage to the structure and contents of Gera's home, for which the Plaintiff, to date, has made payments to Gera exceeding $400,000.00. In a three count Complaint (Doc.1), Federal, exercising its subrogation rights, asserts negligence, breach of warranty, and breach of contract claims against Nikos. The Defendant's Motion for Summary Judgment (Doc. 25) is pending. This Motion will be granted in part and denied in part.

**Standard of Review**

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving

party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Indus. Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty-Lobby, Inc., 477 U.S. 242, 248 (1986).

**Background** [1]

During the relevant period, Kim Hunter ("Hunter") was the caretaker for Gera's Furnace Run Lane property. (Doc. 28 at 3). One of Hunter's responsibilities was to remove ashes from the home's fireplace after each use. Id. At some point in late February 2006, when he was cleaning the fireplace, Hunter found pieces of brick mortar on top of the ashes. In his deposition, Hunter stated that there were "three pieces, probably about the size of an oreo cookie." (Doc. 28 Ex. B at 7). Hunter put the mortar aside, and telephoned Gera to tell him about the find. ( Id.; Doc. 25 Ex. A at 15). Gera instructed Hunter to "[c]all Nikos Chimney and have them come out and clean it and inspect [the fireplace and chimney]." (Doc. 15 Ex. A at 15). Before Nikos

---

[1] The facts, unless the Court notes otherwise, are undisputed.

arrived, Hunter and Gera looked into the fireplace. At his deposition, Gera stated: "The fire box was - that's the first place [Hunter] and I looked to see of anything was there. It was intact." (Doc. 25 Ex. A at 62). Hunter testified that he scheduled the appointment with Nikos to have the chimney cleaned and inspected. (Doc. 28 Ex. B at 8). A Nikos work order signed by Hunter shows that a "sweep" of the furnace and chimney was performed on February 28, 2006. (Doc. 25 Ex. C).

      Hunter was at the house when two Nikos technicians arrived to do the work. He did not remember their names, but did recall that the men told him that "they were there to clean and inspect the chimney." (Doc. 28 Ex. B at 9). He "[s]howed them where the fireplace was, and then . . . took them down in the basement to show them where the furnace was." ( Id.). Hunter testified: "I pointed out the brick mortar. I showed it to the one technician and he basically just brushed it off and said it just fell off the mantle up in side [sic]. I guess there's a light up inside. And he didn't seem very concerned about it." (Id. at 9). While the men worked, Hunter went outside to attend to other chores. (Id.). Hunter observed that one of the men went onto the roof and put a circular wire brush down the chimney, and he could hear a vacuum cleaner in the vicinity of the fireplace inside. (Id. at 10). He did not see other equipment such as a camera or a light, but believed that the technicians had done a visual inspection of the chimney. This belief was based on the fact that when he asked what shape the flue was in, one of the men responded that it "looked good." (Id.). When asked whether he had "actually ask[ed]" if an inspection had been done, Hunter answered that he had. (Id.). According to Hunter, when the flue was being cleaned, "another chunk [of mortar] came down off the mantle." (Id. at 11). It was about "half the size of a tennis ball. It was round and then it had flat edges." One of the technicians told

Hunter that "this fell off the mantle also."  (Id.).

Between the cleaning and the date of the fire, the fireplace was used three or four times without incident, and Hunter did not find additional mortar when he removed the ashes.  (Id.).  On the day of the fire, Gera stacked and lit the wood.  Guests were present in the house.  Hunter did not see them smoking, and testified that Gera did not keep candles in the room where the fireplace was located.  (Id.).

At Federal's request, Jerry E. Isenhour, Sr. ("Isenhour"), who was associated in a unspecified capacity with an enterprise called The Chimney Doctor, Inc, made site inspections of the property in May and June 2006.  He also engaged "a chimney service company based in Pennsylvania to perform an on site video inspection of the interior of the flue systems of the . . . chimney[ ] in June of 2006."  ( Doc. 28 Ex. E at 1).  In a written report to Federal's attorney, Isenhour wrote, "[W]e have reviewed all provided documentation to determine if the performance of [Nikos] was within the Standard of Care of the Chimney Service Industry, and additionally if any actions of the chimney service company could have served to prevent the loss that occurred at [the Furnace Run Lane] location at the time of a fire in April of 2006."  (Id.).  Isenhour wrote that a "normal chimney sweeping operation" would include an assessment of the exterior of the chimney.  His report included photographs of the chimney taken after the fire.  Referring to these pictures, Isenhour commented:

> [T]he exterior of this chimney is quite stained and discolored, this [sic] will alert the chimney technician that there is a problem with rainwater entry and that this may have caused premature deterioration of the masonry chimney.  This view of the chimney would alert the chimneys [sic] sweep technician that there should be a closer look a the chimney for potential issues in regards [sic] the condition of the masonry chimney.

>   \*   \*   \*   \*
>
>   A view of a masonry chimney that reveals dark staining of the exterior of the chimney would alert the technician to further investigate potential hazards.

(Id. at 4).  Referring to close-ups of the exterior brick, Isenhour wrote that these views indicated that the chimney had suffered splintering and cracking as a result of water entry.  "This type of damage will serve to alert the . . . technician that very likely there will be problems in concealed areas and that a more in-depth inspection of these areas is required."  (Id. at 7).  According to Isenhour, "[t]he condition of the chimney is such that a recommendation of no further used until the chimney was properly repaired would have been in order."  (Id.).  A view of the interior of the oil fired central heating flue system showed that "mortar is missing between the . . . flue tiles at the joints."  (Id. at 9).

The interior photographs of the fireplace showed blackening above the chimney, and the presence of "combustible" material too close to the opening.  (Id. at 12).  Isenhour wrote that the blackened paneling should have indicated "performance issues" with the fireplace, and a warning should have been issued to the owner regarding clearance standards for the placement of combustibles.  (Id.).  Additional photographs of the left side of the smoke chamber in the fireplace showed that mortar was "missing in the area where the walls meet."  This area could have been inspected with a mirror and a flashlight.  (Id. at 14).

A video inspection of the interior of the flue performed at Isenhour's request by Renaissance Chimney Inc. showed gaps in the flue tiles in the smoke chamber and oil flue area.  Isenhour attributed these to water damage and poor construction, and stated that they may have allowed the escape of combustion gasses.  (Id. at 23).  It was Isenhour's opinion "that with the

5

issues this chimney present[ed] during a normal visual; [sic] inspection sufficient defects were noted that would have given the technician the basis to present an opinion of not using the chimney further until [it] had bee repaired or replaced.  At a minimum a more thorough inspection should have been suggested prior to any further use." (Id.).  If a more in depth had been conducted, "the fire would not have occurred and the structure would not have been damaged." (Id at 24).

The Chief of the Ligonier Volunteer Fire Department, Robert Beaufort, testified that because he found a waxy substance to the left of the fireplace, he originally concluded that the fire was associated with the use of a candle. (Doc. 28 Ex. D at 13).  After viewing a video of the inside of the chimney provided to him by Federal's attorney, however, he saw that there was a crack on the bottom of the chimney to the lefthand side, and believed that this was the cause of the fire.  (Id.; Doc. 29 Ex. C).  Beaufort observed that there were cracks on the left side of the chimney, but could not say whether they existed prior to the fire.  (Doc 25 Ex. E at 32).

The record also contains excerpts from the deposition testimony of Robert Peterson, a service technician employed by Nikos at the time that the Gera chimney was cleaned.  (Doc. 28 Ex. A at 7).  He did not remember whether he had performed the work at this property.  (Id. at 18).  Peterson testified that one of the duties of a technician cleaning a chimney was to inspect the exterior of the chimney and to look inside the liner.  He would "use[ ] a spot light or a camera down inside the liner to check for any kind of cracks, missing mortar, [or] damage to the crown. (Id. at 12).  "As you're cleaning it, you're inspecting it.  Looking for any kind of – looking for any kinds of signs of damage, missing brick and mortar parts.  And if you come across any of these, you notify the customer right away." (Doc.25 Ex. D at 11).  Evidence of damage to the

chimney, including missing mortar, would have triggered a more in-depth inspection. (Doc. 28 Ex. A at 12). Peterson testified that in the case of a new client such as Gera, or where just a visual inspection had been ordered, cameras were typically used by Nickos technicians. (Id. at 14). In the time that he worked at Nikos, he did not recall a time when he was working for a new client that "pictures were not taken or the camera was not used to look at the chimney[.]" (Id. at 31).

The record also contains standards issued by the National Fire Prevention Association ("NFPA"). These provide that a Level I inspection involving readily accessible areas of the chimney exterior and interior and accessible portions of an appliance and chimney connection should be performed in conjunction with routine cleaning. (Doc. 24 Ex. F at Table II-3). A more in-depth Level II inspection includes inspection of all accessible portions of the chimney exterior and interior and use of video scanning equipment "or other means of inspection" where "an external event [is] like to have caused damage to the chimney" or where there is an "operating malfunction." (Id.).

The Plaintiff's second expert, Joey Wilson ("Wilson"), of Unified Investigations & Sciences, Inc. in Columbus Ohio, conducted post-fire site investigations on April 28, 2006 and May 24 2006. (Doc. 25 Ex. H at 1). Wilson concluded that "burn patterns supported a problem at the area of the smoke chamber/firebox" and noted that there was an "access route for fire out of the firebox into the wood framing [to the left of] the firebox. Mortar degradation allowed a path just below the smoke shelf. . . The area of the penetration was measured 44 inches above the floor." (Id. at 5). Wilson did not state that the breach in the firebox existed at the time that the Defendant cleaned the chimney, or that it would have been discoverable during a typical

7

sweep. She did observe that Gera had called Nikos because smoke from the fireplace was backing into the living room and mortar had been found in the firebox, stating, "[t]he chimney company never recommended to Mr. Hunter . . . that the chimney should be 'cameraed.'" (Id. at 6).

### Discussion

Federal contends that the evidence as summarized is insufficient to demonstrate the Defendant's entitlement to summary judgment as to any of the claims advanced in the Complaint. The Court addresses Federal's claims seriatim.

#### Breach of Contract

It is undisputed that Nikos contracted with Gera to clean the chimney at the Furnace Run Road property. Federal claims that in failing to perform its obligations under the contract in a professional and safe manner, it breached its agreement with Gera. Had Nikos acted in a professional manner in accordance with its own routine practices or with standards promulgated by the National Fire Prevention Association and observed in the industry, it would not have ignored obvious conditions warranting a more thorough examination of the chimney, and would have discovered problems creating a risk of fire when the fireplace was used.

Nikos's first response to this claim is that its contract with Gera covered cleaning, not inspection:

> As the evidence establishes that this Defendant was contracted to perform cleaning and sweeping services, and there is no question of material fact that [it] performed the services that it was contracted to perform, including a cleaning and sweep, all claims for breach of contract should be dismissed with prejudice.

(Doc. 25 at 4). The Court finds that Nikos's argument is insufficient to defeat the breach of

contract claim. The record is clear that Gera called Nikos in response to a specific concern - multiple pieces of mortar atop ashes in the fireplace, and that this problem was brought to the attention of the technicians before they began work. Moreover, the record establishes that at least some degree of inspection was part of the cleaning service provided by Nikos. The transcript of Peterson's deposition documents the following exchange between Peterson and Federal's attorney:

> Q. Can you walk me through the procedure that you followed for cleaning the chimney?
>
> A. Um, yes. Um, First you have a gentleman that's outside that goes up on the roof cleaning it from the outside in. You have a gentleman that's inside. . . And as you're cleaning it, you're inspecting it. Looking for any kind of - - looking for and kind of signs of damage, missing brick and mortar parts. And if you come across any of that, you notify the customer right away.

(Doc. 25 Ex. D at 11). This evidence, especially when considered against the background of testimony offered by Federal's experts, is narrowly sufficient to raise an inference that the exterior condition of the chimney at the time of the sweep and the presence of mortar in the ashes should have alerted Nikos that, at a minimum, additional investigation of the safety of the chimney and the fireplace was required.

While it is true that the excerpts of the experts' reports do not address whether the firebox breach existed and was detectable during the sweep, this is not enough to warrant a grant of summary judgment in favor of the Defendant. As the case now stands, it is unclear whether what was or should have been observed would have disclosed an existing breach in the firebox or another condition which, if unremedied, presented an imminent risk of fire.

The Court's decision to deny the Defendant's Motion for Summary Judgment on the breach of contract claim does not, of course, imply a belief that Federal will be able, ultimately, to prove a breach of Gera's contract with Nikos; it means only that it will have the opportunity to try. [2]

Negligence

Although the parties do not raise this issue, the Court finds that the negligence claim is barred by the gist of the action doctrine. "'Pennsylvania's "gist of the action" doctrine bars plaintiffs from bringing a tort claim that merely replicates a claim for breach of an underlying contract.'" Blue Mtn. Mushroom Co., Inc. v. Monterey Mushroom, 246 F. Supp.2d 394, 402 (E.D. Pa. 2002) (quoting Werwinski v. Ford Motor Co., 286 F.3d 661, 680 & n.8 (3d Cir. 2002)). The purpose of the doctrine is to "maintain[ ] the separate spheres of the law of contract and tort." N.Y. State Elec. & Gas Corp. v Westinghouse Elec. Corp., 564 A.2d 919, 925 (Pa. Super. 1989). "Under Pennsylvania law tort claims allegedly committed in the course of carrying out a contractual agreement are dismissible if the 'gist' of them sound in contract instead of tort." Quorum Health Res., Inc. v. Carbon- Schuylkill Comm. Hosp., 49 F. Supp.2d 430, 432 ( E.D. Pa 1999) (collecting cases). The gist of the action where "the breach of duties imposed [is] by mutual consensus." Phico Ins. Co. v. Presby. Med. Serv. Corp., 663 A.2d 753, 757 (Pa. Super. 1995). In contrast, claims sounding in tort arise "from the breach of duties imposed as a matter of social policy." Id. Thus, the doctrine:

---

[2] While the breach of contract claim survives, the claim based on breach of implied warranty cannot. The Court has undertaken an independent review of the case law, and agrees with Federal that Pennsylvania law, as it has developed over the last century, recognizes an implied warranty of workmanship only in cases involving construction or sale of residential or commercial property. See Elderkin v. Gaster, 288 A.2d 771 (1972) and cases relying thereon.

> Acts to foreclose tort claims: 1) arising solely from the contractual relationship between the parties; 2) when the alleged duties breached were grounded in the contract itself; 3) where any liability stems from the contract; and 4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.

Reardon v. Allegheny Coll., 926 A.2d 477, 486 (Pa. Super.2007) (citing Hart v. Arnold, 884 A.2d 316, 340 (Pa. Super. 2005)).  See also 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §2729 (3d. ed. 2004).

The Court is satisfied that the criteria listed in Reardon are satisfied here.  While Federal has included a negligence claim in its complaint, it is clear that this claim is based upon duties grounded in the contract made between Gera and Nikos.  The essence of Federal's claim is that Nikos failed to exercise due care in performing its obligations under the contract, and that this failure caused significant damage to Gera's property.  In order for an action to be construed as one sounding in tort, the contract must be collateral.  A contract action does not become a tort action by virtue of allegations in the complaint that contractual duties were negligently performed.  See Redev. Auth. of Cambria County v. Int'l Ins. Co., 685 A.2d 581 (1996).  The essential distinction between contract and tort actions is that liability in negligence is imposed as a matter of social policy while liability for breach of contract derives from duties imposed the parties' agreement.  See Bash v. Bell Telephone Co., 601 A.2d 825, 830 (1992) superceded by rule on other grounds as stated in Keefer v. Keefer, 741 A.2d 808, 812 (Pa. Super.1999).  Had there not been a contract between Gera and Nikos, there would be no basis for liability here.  As a result, the Court finds that Nikos is entitled to summary judgement as to the negligence claims asserted in Count I of the Complaint.

**Conclusion**

For the reasons set out above, the Motion for Summary Judgment (Doc. 25 ) filed by the Defendant will be granted with respect to the negligence and breach of warranty claims pled in Counts I and II, and denied as to the breach of contract claim pled in Count III of the Complaint. An appropriate Order follows.

By the Court,

/s/ *Amy Reynolds Hay*
Chief Unites States Magistrate Judge

Dated:   17 November, 2009

cc: Counsel of Record via CM-ECF